The relief described hereinbelow is SO ORDERED.

Signed May 06, 2008.



_____
ROBERT D. BERGER
United States Bankruptcy Judge

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In re:

**WILLIE CLARENCE PAYNE and**                                     **Case No. 01-23896**
**VALERIE EVELYN PAYNE,**                                                **Chapter 13**
              **Debtors.**

_____

**WILLIE CLARENCE PAYNE and**
**VALERIE EVELYN PAYNE,**
              **Plaintiffs,**


       **v.**                                                                          **Adv. No. 04-06078**


**MORTGAGE ELECTRONIC REGISTRATION**
**SYSTEMS, INC., et al.,**
              **Defendants.**

_____

### MEMORANDUM OPINION ON COMPLAINT TO DETERMINE VIOLATIONS OF
### AUTOMATIC STAY AND REAL ESTATE SETTLEMENT PROCEDURES ACT

        Debtors'/Plaintiffs' adversary complaint (Doc. No. 1) alleging violations of the automatic

stay and the Real Estate Settlement Procedures Act (RESPA)[1] against defendants Mortgage

Electronic Registration Systems, Inc. (MERS), and Everhome Mortgage Co. f/k/a Alliance

_____

        [1] 12 U.S.C. §2605 *et seq.* and Regulation X,  24 C.F.R. §3500.

Mortgage Co. (Everhome) is before the Court after a trial.[2]   The Court has jurisdiction to hear

this matter.[3]   Based on the facts and arguments presented as well as pertinent legal authority, the

Court hereby enters the following findings of fact and conclusions of law pursuant to Fed. R.

Bank. P. 7052.  To the extent these conclusions of law contain any items which more

appropriately should be considered a finding of fact, or vice versa, such items are incorporated as

such by this reference.

**Findings of Fact**

**A.      Background**

Debtors executed a $55,726.00 note at nine percent interest with Amerifirst Investment

Co. on May 11, 1994, secured by a mortgage on their home.  The loan is an FHA insured loan,

subjecting the lender and Debtors to FHA/HUD regulations governing default.  Immediately

after origination, the loan was assigned to Regional Investment Co.  In early 2000, the loan was

assigned to Alliance Mortgage, now known as Everhome.  At the time the note was assigned to

Everhome, the mortgage was assigned to MERS on behalf of Everhome.  In the course of

servicing Debtors' loan,  Everhome sent Debtors several letters with a return address in

Jacksonville, Florida.  Debtor Valerie Payne testified she never received a notice of change of

servicer; however, the evidence shows Debtors knew who was servicing the loan and how to

contact Everhome.[4]  Everhome established an exclusive address to receive qualified written

---

[2]  Debtors appear by their attorney, William D. Peters, Kansas City, Kansas.  Defendant Mortgage Electronic
Registration Systems, Inc., appears by its attorney, Linda S. Mock, Overland Park, Kansas.
[3]  The parties do not dispute the Court's jurisdiction.  The Court finds it has jurisdiction over this proceeding
under 28 U.S.C. §1334 and 28 U.S.C. §157.
[4]  The February 16, 2000, Notice of Assignment, Sale or Transfer of Servicing Rights is in the Court's file
in the main case, No. 01-23896, Doc. No. 41 at 68-70.

- 2 -

08.05.05 Payne v MERS.wpd

requests for information concerning a borrower's loan. The parties stipulated Everhome is the new name for Alliance.

The mortgage agreement provides Debtors shall include an installment for taxes and insurance premiums with their monthly payment for Everhome to hold in escrow to satisfy such obligations as they become due. The mortgage agreement also provides Debtors' payments shall be applied in the following order: (1) mortgage insurance premiums; (2) taxes and hazard insurance; (3) interest; (4) principal; and (5) late charges. If Debtors fail to make the required escrow payments, or if there is a legal proceeding which may affect Everhome's rights (including bankruptcy), then Everhome "may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance, and other items mentioned in paragraph 2. Any amount disbursed by Lender under this paragraph shall become an additional debt of Borrower and be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement, at the Note rate, and at the option of Lender, shall be immediately due and payable."[5]

Debtors fell behind on their mortgage payments in April 2000. After a temporary forbearance period, Defendants began a foreclosure action in August 2001. Debtors filed for Chapter 13 bankruptcy protection on December 12, 2001. Pursuant to Debtors' confirmed plan, Debtors would cure their pre-petition arrearage over 21 months through the plan. Debtors would make their ongoing post-petition payments of $589.63 a month directly to Everhome. Since Debtors' case began, Everhome has never notified Debtors to pay any amount other than $589.63 a month to cover Debtors' monthly principal, interest and escrow payments. Debtors at

---

[5] Plaintiffs' Trial Ex. 1.

all times post-petition believed they were paying sufficient funds monthly to cover principal, interest and escrow costs.

Everhome filed a proof of claim showing a principal balance of $52,406.38 and arrearage of $7,325.39, which included 10 past due monthly payments totaling $5,996.07, late charges of $247.78, property inspection fees of $185.00, an escrow shortage of $591.54, and foreclosure costs of $305.00. Debtors objected to the allowance of the claim, challenging the late charges, inspection fees, escrow shortages, and foreclosure costs. Debtors disputed the total amount of past due payments, claiming they owed $3,625.00. Everhome failed to respond to Debtors' claim objection, so the Court entered an Order granting Debtor's objection on March 25, 2002. The Order allowed Everhome an unsecured $3,625.00 claim. One year later, Everhome realized it missed the objection and moved the Court to reconsider. After seven months, the parties entered an agreed order on October 6, 2003, whereby the past due payments totaling $5,996.07 would be an allowed secured claim. By agreeing to the Order, Everhome waived its claim to the other amounts contained in its original proof of claim and those amounts were disallowed.

**B.      Everhome's Post-Petition Accounting and Servicing of Debtors' Loan**

The Order Confirming Plan was entered on March 19, 2002. The first Order granting Debtors' objection to Everhome's proof of claim and establishing Everhome's unsecured claim at $3,625.00 was entered March 25, 2002. Thus, for the next year and a half, until October 2003, the Chapter 13 Trustee made disbursements under the confirmed plan and according to Everhome's allowed unsecured $3,625.00 claim. The Trustee made the following payments to Everhome:

(1)      For the period ending April 30, 2002:                      $2,724.91[6]

---

[6] Main Case No. 01- 23896, Doc. No. 33.

- 4 -

Everhome processed the payment on June 18, 2002.[7]  On June 25, 2002, Everhome applied the Trustee's payment to Debtors' August, September, October, and November 2001 monthly payments and to a $23.59 late charge, leaving $329.92 unaccounted for, or held "in suspense."[8]  Everhome applied the Trustee's payments to pre-petition debts; however, the late charge had been disallowed and was never reinstated.

    (2)    For the period ending June 18, 2003:              $139.94[9]

Everhome processed the payment on June 13, 2003, but did not apply it to any balance. Everhome held the entire payment in suspense.

    (3)    For the period ending November 18, 2003:        $760.15[10]

Everhome processed four payments totaling $760.15 in this time frame as follows:

        (a)    Everhome processed a $302.77 payment on July 10, 2003.  On August 8, 2003, with amounts already held in suspense, Everhome applied the Trustee's aggregate payments to Debtors' January 2003 monthly payment and a $23.71 pre-petition late charge.

        (b)    Everhome processed a $151.39 payment on August 14, 2003, but did not apply it.  Everhome held the entire payment in suspense.

        (c)    Everhome processed a $164.55 payment on September 10, 2003, but did not apply it.  Everhome held the entire payment in suspense.

        (d)    Everhome processed a $141.44 payment on October 9, 2003.  On October 21, 2003, with the amounts already held in suspense, Everhome

---

[7]  Plaintiffs' Trial Ex. 32 informs when and how Everhome processed a payment.
[8]  A suspense account is a place to hold payments until enough funds are accumulated to satisfy one monthly payment in full.
[9]  Main Case No. 01- 23896, Doc. No. 48.
[10]  Main Case No. 01- 23896, Doc. No. 55.

08.05.05 Payne v MERS.wpd

applied the Trustee's aggregate payments to Debtors' March 2003
monthly payment.  After holding part of the payments for over two
months, Everhome finally applied the Trustee's payments to post-petition
debts.

The payments made from the Chapter 13 Trustee to Everhome by October 2003 totaled $3,625.00.  This would have paid in full Everhome's first allowed arrearage claim.  However, the October 6, 2003, Order reinstated $2,371.07 of the original claim, bringing Everhome's claim back up to $5,996.07.[11]  Thus, if properly applied, the Trustee's payments should have satisfied six of ten months of pre-petition arrearage.  The Trustee's payments should not have paid post-petition debts, disallowed late fees, or have been held in suspense for months.  After the October 6, 2003, Order, Debtors should have been current on their post-petition payments and should have had four months of pre-petition arrearage remaining to pay through the plan.

Everhome does not change its accounting after a borrower files for bankruptcy. Payments are simply entered into a computer and applied. When Everhome received a payment, whether it was from the Chapter 13 Trustee for the arrearage or from Debtors for the then currently due installment, Everhome applied the funds to the oldest outstanding contractual obligation due under the note.  If a payment were insufficient to satisfy a contractual obligation in full, Everhome would place the funds in a suspense account.  Further, in this case, Everhome refused to remove amounts from its accounting which were specifically disallowed by the Court. Late charges of $247.78, property inspection fees of $185.00, escrow shortages of $591.54, and foreclosure costs of $305.00, disallowed in the October 6, 2003, Order, remained on Everhome's

---

[11]  Main Case No. 01- 23896, Doc. Nos. 53 and 58.

records "[because] they are a part of the routine accounting of the servicing of this loan" and remain on Everhome's records "until it is paid."[12]

In January 2004, Everhome advised Debtors they were in default post-petition for five payments from September 2003 through January 2004. Upon further inquiry by Debtors who maintained they had tendered all payments, Everhome discovered it was holding two uncashed checks and $451.24 in suspense. In late 2003, when the Trustee had made four relatively small payments in four months, Everhome had held the payments in suspense until enough money accumulated to satisfy one monthly post-petition payment. Everhome then began rejecting Debtors' post-petition payments because Everhome's own accounting erroneously recorded the Trustee's payments as untimely and insufficient monthly payments from Debtors. Although Everhome said it later credited the post-petition payments and declared Debtors current through February 2004, it did not correct its system or its payment history. Further, while Everhome said it credited the two payments, two payments remain unaccounted for nonetheless. Excluding the Trustee's 2003 payments, Everhome recorded only 10 payments by Debtors in 2003, not 12. In 2004, when Everhome discovered it was holding two checks, Everhome still only credited Debtors 11 payments in 11 months. Thus, two post-petition payments from Debtors are still missing. Debtors testified they made all monthly post-petition payments outside the plan. Everhome did not rebut this testimony. Accordingly, the evidence shows the error is Everhome's to bear. Everhome also assessed three late charges against Debtors in late 2004, even though it was Everhome which did not credit the tendered payments.

Everhome's customer account documents provided to Debtors and produced at trial do not show the Debtors are considered current for post-petition payments. In fact, Everhome's

---

[12] Trial Tr. 161.

08.05.05 Payne v MERS.wpd

Customer Account Activity Statement[13] leads the reader to believe Debtors were seven months delinquent post-petition as of November 2, 2004. By comparing the Trustee's and Everhome's records, the seven-month apparent delinquency is explained as follows. First, Everhome received a February 11, 2002, payment of $589.63 which was never applied to principal, interest, escrow, or any other charge apparent from the record.[14] Second, according to the Bankruptcy History, after Everhome began applying the Trustee's payments in August 2003, Everhome lost or failed to credit two months of post-petition payments by Debtors as of November 2, 2004.[15] Thus, with Debtors' remaining four months of pre-petition arrearage payments to pay through the plan, Everhome's failure to apply the February 2002 payment, and Everhome losing two post-petition payments, these seven "missed" payments account for the apparent seven-month delinquency as of November 2, 2004. Had Everhome properly applied the $3,625.00 it received from the Trustee, the February 2002 payment, and the two lost payments in late 2003, Debtors would have been current on their post-petition monthly payments with only four months of pre-petition arrearage, or $2,371.07, left to pay.

### C.     Debtors' Post-Petition Deficiency

Proper payment application is just the first issue raised by Debtors. Debtors also face an $8,879.31 escrow deficiency, $735.00 in inspection fees, $928.91 in late fees, and $2,455.00 in legal costs as of the trial date.

### 1.     The Escrow Deficiency

---

[13]  Plaintiffs' Trial Ex. 32.

[14]  Customer Account Activity Statement (Plaintiffs' Trial Ex. 32). Exhibit 32 is incomplete. Activity for September 2002 through December 2002 is missing, making a complete accounting of this loan impossible.

[15]  Plaintiffs' Trial Ex. 33.

- 8 -

08.05.05 Payne v MERS.wpd

Since the petition date, Debtors have paid $589.63 a month for ongoing debt service. Everhome's records indicate the proper debt service payment as of the petition date was $592.85 a month. Debtors have been accumulating a $3.22 deficit each month since the petition date. Exacerbating this shortfall is the fact Debtors' taxes and insurance premiums have risen since the petition date. The $144.47 monthly allocation to the escrow account has long been insufficient to cover the actual expense.

Everhome admits it avoided contact with Debtors while they were in bankruptcy. Everhome sent no statements, no notices, not even a payment or coupon book. Everhome's representative testified Everhome does not send payment books to mortgagors in bankruptcy because Everhome cannot present a true and accurate accounting of the loan payments Everhome is receiving from the Trustee as opposed to debtors' payment history. Everhome does not dispute it has not done an annual escrow analysis since the petition date. Everhome says its policy is not to conduct the analysis while debtors are in bankruptcy. Everhome admits it never sent Debtors any notice of shortfalls or deficiencies in the escrow payments or the debt service since the case began. Meanwhile, Everhome advanced all taxes, hazard insurance premiums, and mortgage insurance premiums from the petition date to the trial date, creating a huge deficiency unknown to Debtors. Everhome's representative testified Everhome does not notify borrowers in bankruptcy of escrow shortages or deficiencies "because the escrow payments are going to be behind because the bankruptcy plan payments are running behind. *The loan is in default as far as the current payment that is due*."[16] However, the representative then testified, "[Everhome] doesn't do an escrow analysis during the time that the loan is in bankruptcy because *we don't consider those as in default*. So the analysis is done once the loan comes out

---

[16] Trial Tr. 207 (emphasis added).

of bankruptcy, then we will do an analysis and coupons would be sent to the borrower reflecting

the payment adjustment and if there are shortages."[17]  Debtor Valerie Payne testified as follows

regarding her frustration with Everhome's policy:

> But the problem is, why should I have to come up with a lump sum of
> money when you [Everhome] could have allocated the money out – in the
> payment like every – why am I treated differently that I can't get my information
> like everybody else?  Everybody else receives a normal coupon book.  They
> receive what their interest is.  They know what they have to pay on their taxes.
> They know when there is a shortage.  They know when there is an overage.  They
> know – why don't we know that?  Why don't we have any information like that?
> All we asked is just to be treated like normal people so we would know.  And
> then that way we wouldn't have to come up with $4,000 at the end of the year, we
> could have paid it out in payments like normal.[18]

Everhome admitted their computer system does not allow debtors who make all their payments

in a timely manner to exit bankruptcy current on their mortgage obligation.  In this case,

Everhome was apparently planning to send Debtors coupons after 60 months reflecting a

payment adjustment to recover $8,879.31 post-discharge.  Attempting to recover that amount as

Debtors emerge from bankruptcy would mean an increase in Debtors' monthly payment from

$589.63 to $1,329.57 to recover the shortage in one year.  By contrast, had Debtors received an

annual adjustment averaged over the time the deficiency accrued, their monthly payment would

have been $737.62.

### 2.    Inspection Fees

Everhome ordered 23 drive-by inspections of Debtors' property over 29 months.  Debtor

Valerie Payne testified she and her husband have continuously occupied the house and

maintained it.  She stated she never received notice Everhome was conducting drive-by

inspections and charging her for them.  Everhome's representative testified the drive-by

---

[17]  Trial Tr. 208 (emphasis added).
[18]  Trial Tr. 120.

08.05.05 Payne v MERS.wpd

appraisers are supposed to leave a notice at the door, but Everhome's representative had no

knowledge of whether the appraiser actually did.

### 3.    Late Fees

Everhome claims $928.91 in late fees as of the trial date.  Everhome's original proof of

claim had included $247.78 in late fees.  These fees were never removed from the account

despite the fact Everhome expressly waived the fees by its agreement to the stipulated October 6,

2003, Order.  Everhome had applied Trustee payments to two late fees.  In March 2004,

Everhome told Debtors they still owed $247.90 in late fees.  Everhome then charged three more

post-petition late fees in September, October, and November 2004.[19]  Debtors testified they made

all their payments on time.  Everhome did not rebut this testimony.  Everhome's records indicate

considerable lag time between its receipt of Trustee's payments and application of those

payments to the account.  Everhome presented no evidence as to which payments were late and

assessed a late fee.  Neither party addressed whether the lost payments may have precipitated the

assessment of late fees because the account was perpetually running seven months behind where

it should have been.

### 4.    Legal Costs

Everhome claimed attorney's fees and costs totaling $1,455.00 and foreclosure costs of

$1,000.00 for a total legal bill of $2,455.00.  Everhome's original proof of claim had included

$305.00 in foreclosure costs.  These costs were never removed from the account despite the fact

Everhome expressly waived the costs by its agreement to the stipulated October 6, 2003, Order.

In March 2004, Everhome advised Debtors they owed $305.00 in "attorney costs" and $1,150.00

in "attorney fees," which equals the $1,455.00 in attorney's fees and costs.  That leaves an

---

[19]  Everhome's Customer Account Activity Statement abruptly ends on November 16, 2004.

08.05.05 Payne v MERS.wpd

additional $1,000.00 in foreclosure costs which have been assessed against Debtors' account since March 2004 without proof Everhome actually incurred the expense. Everhome never moved for relief from the automatic stay and provided no explanation at trial as to the additional $1,000.00 in foreclosure costs. Everhome never disclosed its attorney's fees to the Court or to the Trustee at any time prior to trial. Attorney's fees were not included in the original proof of claim. Everhome never filed a Rule 2016(a) application for compensation or reimbursement of either of these expenses.

      **D.      Debtors' Qualified Written Request**

In early 2004, while Debtors were dealing with Everhome's erroneous declaration of default, Debtors received their 2003 Mortgage Interest Statement. The statement provided a payoff amount of $61,260.47. This amount alarmed Debtors because they understood their principal balance to be under $52,000.00, taking into account their post-petition payments. On February 20, 2004, Debtors' counsel wrote Defendants' counsel, noting the principal balance was $52,406.00 as of the petition date and requesting an explanation of the almost $9,000.00 added to the payoff amount. In response, Defendants' counsel advised Debtors' counsel to contact Everhome directly for an explanation. On March 25, 2004, Debtors' counsel sent a certified letter to Everhome at its Jacksonville, Florida, address. The letter provided Debtors' names, loan number, and bankruptcy case number. The letter explained the history of Everhome's claim in the bankruptcy and requested a narrative explanation, in addition to an accounting, detailing Everhome's application of all post-petition payments from the Debtors and the Trustee. The letter also advised Everhome Debtors were seeking to refinance their home and pay off the note. Debtors requested a response by April 15, 2004.

Meanwhile, Debtors found some real property they wished to purchase for a new mobile home. They sought refinancing of their old home with Mortgage Professionals Incorporated ("MPI"). On March 5, 2004, Debtors received a good faith estimate for a new $92,000.00 loan with a nine percent interest rate. The loan amount was based on a $55,726.00 payoff for the Debtors' old home. After closing costs, Debtors expected to receive about $28,000.00 to apply toward the new home site. On March 23, 2004, Debtors signed a Land Real Estate Sale Contract to purchase the new property for $25,000.00 and paid $100 as an earnest money deposit. Debtors paid $250 to have the house appraised. On March 30, 2004, MPI requested a payoff from Everhome. MPI said it was using the $61,260.47 estimated payoff figure pending Everhome's response. Everhome's counsel responded the same day to Debtors and Debtors' attorney, but not to MPI. Everhome's response was a one-page itemized payoff amount good through April 25, 2004, totaling $58,082.30, which included $50,413.60 in principal, $2,646.70 in interest, a $3,311.56 escrow deficiency, and $2,169.40 comprised of late charges, inspection fees, insurance, attorney's fees, and costs. The letter also gave a $458.96 credit still held in suspense. On April 2, 2004, Debtors' counsel renewed his request for a detailed explanation of the latest payoff figure. Debtors' counsel noted some of the amounts included in the March 30 payoff amount had been previously disallowed by the Court's October 6, 2003, Order, specifically, pre-petition attorney fee's, late fees, inspection fees, and a portion of the escrow deficiency. On May 14, 2004, 50 days after first writing directly to Everhome, Debtors filed suit. Debtors did not file a motion with the Court to incur debt and abandoned their refinancing efforts. On December 8, 2004, Everhome through counsel provided Debtors with another payoff amount of $57,292.05, which included $49,983.94 in principal, $3,373.92 in interest, $4,092.33

- 13 -

in escrow deficiencies, $220.00 in inspection fees, $61.50 for insurance, and crediting $439.64 held in suspense. Everhome removed charges for late fees and attorney's costs and fees.

On December 17, 2004, Debtors' counsel specifically requested from Everhome's counsel the correct amount for Debtors' future monthly debt service so they could stop incurring a post-petition deficiency in the escrow account. Debtors repeated the request on February 16, 2005. By trial, although Everhome knew the amount of the escrow deficiency, Everhome had not communicated an adjusted payment schedule to Debtors to address the growing deficiency.

Debtors allege Everhome caused Debtor Valerie Payne emotional distress to the point she became ill and sought medical treatment. Payne testified she incurred approximately $500 in medical costs over the three years this dispute has continued with Everhome.

Debtors allege Everhome violated the automatic stay by the way Everhome applied payments and by including disallowed fees in its payoff letters to Debtors. Debtors further allege Everhome violated RESPA by failing to respond to their inquiries regarding the loan in the manner required by federal law and by failing to provide them with statutory notices of the escrow deficiency. Debtors allege Everhome violated both the automatic stay and RESPA by allowing the escrow deficiency and other post-petition charges to increase without notice to Debtors.

### Conclusions of Law

Debtors identify two significant errors in Everhome's servicing of their loan in bankruptcy and many minor errors. First, Everhome did not differentiate between payments from the Trustee meant to cure the allowed, pre-petition arrearage claim and Debtors' post-petition payments which were meant to keep Debtors current through the course of their bankruptcy case. Instead, Everhome applied payments from the Trustee to disallowed pre-

- 14 -

petition late charges and to post-petition payments. In applying the Trustee's payments to amounts not provided for in the plan, Everhome charged Debtors excessive interest and wrongly accused Debtors of a post-petition default. Second, Everhome allowed the escrow deficiency and other post-petition charges to grow unchecked and without notice to Debtors. As a result, Debtors, who entered bankruptcy with a $5,996.07 arrearage debt, were unknowingly working through a bankruptcy plan only to emerge with more than an $8,879.31 arrearage debt. Everhome then failed to timely apply payments, lost payments, charged late fees for lost payments, ran up inspection costs without cause, and assessed foreclosure fees for no apparent reason.

Debtors initially characterized Everhome's actions as creating a stealth lien, meaning Everhome impermissibly serviced the loan in a manner to increase secretly its claim and its corresponding lien against Debtors' home at a time Debtors' plan called for Debtors to emerge from bankruptcy current on their mortgage obligations. Debtors allege Everhome thereby violated the automatic stay and circumvented the plan. In their complaint, Debtors assert stay violations and RESPA violations of §2605(e), which requires lenders to respond to borrowers' qualified written requests for information concerning their loan. In the Final Pretrial Order, Debtors' characterization of Everhome's actions evolved to include a violation of RESPA §2609(b), which requires lenders to provide borrowers with notice of escrow deficiencies not less than annually. RESPA does not provide a private right of action under §2609. However, remedies for alleged unlawful lender conduct, including assessing undisclosed post-petition fees, may be pursued under 11 U.S.C. §362 for violating the automatic stay if the lender attempts to collect the fees from estate property,[20] under 11 U.S.C. §105 for violating the confirmation

---

[20] *See, e.g., In re Jones,* 366 B.R. 584, 600 (Bankr. E.D. La. 2007).

- 15 -

order,[21] and under RESPA §2605 for failing to respond to a qualified written request, which would require the lender to disclose a full and accurate accounting of the loan.[22]

The Pretrial Order supersedes the pleadings and controls the case.[23]   The Pretrial Order should be "liberally construed to cover any of the legal or factual theories that might be embraced by their language."[24]  At trial, Everhome objected to evidence regarding the lack of notice of post-petition increases in the escrow deficiency.  The Court took the objection under advisement pending its review of the Pretrial Order entered on March 1, 2006.  Pursuant to the Pretrial Order, the theories of recovery and the issues of law to be determined at trial specifically included allegations of Everhome's failure to provide Debtors notice of post-petition fees, including increased escrow deficiencies, inspection fees and attorney's fees.  The Court's subsequent refusal to allow Debtors to amend their complaint to allow a claim for breach of contract is irrelevant to the issues the parties themselves defined in the Pretrial Order.  Defendants' trial objection is overruled.

### A.    Everhome Violated the Confirmation Order

Unnoticed post-petition charges can derail a debtor's Chapter 13 plan and keep a successful debtor from achieving the ultimate bankruptcy goal – a fresh start.[25]   Debtors must be advised when post-petition charges are being assessed against their account so they can fulfill their expectation of addressing their debt in bankruptcy and emerge with their secured debt

---

[21]  *See, e.g., In re Jones, slip copy,* 2007 WL 2480494, at *2 (Bankr. E.D. La. Aug. 29, 2007); *In re Sanchez,* 372 B.R. 289, 311 (Bankr. S.D. Tex. 2007); *In re Padilla,* 379 B.R. 643 (Bankr. S.D. Tex. 2007).

[22]  *See, e.g., In re Laskowski,* – B.R. –, 2008 WL 835277, at *9 (Bankr. N.D. Ind. Feb. 27, 2008).

[23]  *In re Miner,* 369 B.R. 655, 672 (Bankr. D. Kan. 2007).

[24]  *Id.*, citing *Lohmann & Rauscher, Inc. v. YKK (U.S.A.) Inc.,* 477 F. Supp. 2d 1147, 1151-52 (D. Kan. 2007)(quoting *Trujillo v. Uniroyal Corp.,* 608 F.2d 815, 818 (10th Cir. 1979)).

[25]   *Sanchez,* 372 B.R. at 302; *Jones,* 366 B.R. at 596.

- 16 -

current.[26]  The bankruptcy court retains jurisdiction post-confirmation.[27]  Section 105 allows the Court to issue orders necessary to assure the Code's purposes are fulfilled.[28]  The Court and the Chapter 13 Trustee are charged with fully administering a case through completion. Administering a successful Chapter 13 plan requires full disclosure from all participants and requires that plan confirmation is not thwarted by mortgagees who assess unnoticed increases in the borrower's debt believing they can collect from their collateral upon completion of an otherwise successful Chapter 13 plan.  Fees and expenses charged by lenders after confirmation remain subject to court review for reasonableness.[29] Post-petition fees and charges are subject to review under the debtor's plan, state law, Fed. R. Bankr. P. 2016(a), and §105.[30]

A mortgage lender's exercise of its contract rights is not without limits while the borrower works through a Chapter 13 plan.[31]  While §1322(b)(2) preserves a lender's pre-petition rights and protects them from modification through the plan, a "contractual right to seek reimbursement is not the equivalent of a right to collect an undisclosed charge from the estate."[32] Since December 17, 2007, Standing Order 07-4 has been in effect to keep mortgagees from assessing post-petition charges without notice to debtors.  In 2008, the District of Kansas prepares to implement mandatory conduit mortgage payments in Chapter 13 cases.  These orders are deemed essential to avoid Chapter 13 debtors emerging from bankruptcy in default based upon post-petition increases to their mortgage debt service.  Prior to these practice tools, Fed. R. Bankr. P. 2016 should have facilitated disclosure and would have applied equally to post-

---

[26]  *Jones,* 366 B.R. at 598.
[27]  *In re Watson,* – B.R. –, 2008 WL 934771, at *4 (Bankr. D. Del. Apr. 7, 2008).
[28]  *Padilla,* 379 B.R. at 658, citing *Marrama v. Citizens Bank of Mass.,* 127 S. Ct. 1105 (2007).
[29]  *In re Andrews,* 2007 WL 2793401, at *2 (Bankr. D. Kan. Sept. 26, 2007) (citations omitted).
[30]  *Id.*
[31]  *Padilla,* 379 B.R. at 656.
[32]  *Jones,* 366 B.R. at 600, citing *In re Campbell,* 361 B.R. 831 (Bankr. S.D. Tex. 2007).

- 17 -

confirmation charges as to pre-confirmation charges.[33]  When lenders disclose post-petition

charges to the debtor and the court by filing a Rule 2016 application, the assessment and

collection of inspection fees, attorney's fees, and other costs does not violate the stay.[34]  Rule

2016 does not conflict with §1322(b)(2) because Rule 2016 does not deny lenders the ability to

assess and collect post-petition contractual fees.  Rather, Rule 2016 requires the lender to

disclose the charges and receive court approval.[35]   The procedure protects both the lender and

the borrower.  It also protects against accruing an insurmountable deficit after a 60-month plan.

As *Padilla* noted, the Court cannot administer an estate in an efficient and equitable manner

without requiring creditors to file a Rule 2016(a) application for post-confirmation expenses to

ensure creditors comply with plan confirmation.[36]

 Further, post-petition fees and charges and post-petition defaults may be cured and paid

under a modified plan.[37]  The right to modify a plan post-confirmation and the ability to address

post-confirmation debt service increases is lost if lenders are allowed to keep debtors in the dark

as to their true post-petition debt obligations.  Without knowledge of escalating post-

confirmation charges, debtors cannot protect their right to a fresh start after otherwise

successfully emerging from Chapter 13.

 Everhome's combination of servicing errors and RESPA violations robbed Debtors of a

fundamental goal of bankruptcy – to emerge with a fresh start.  Despite the fact Debtors' plan

allowed them to repay the pre-petition arrearage through the plan and make ongoing post-

petition payments directly to Everhome, Everhome did not apply the payments it received

---

[33] *Padilla,* 379 B.R. at 657.
[34] *Sanchez,* 372 B.R. at 314.
[35] *Padilla,* 379 B.R. at 657.
[36] *Id.* at 659.
[37] 11 U.S.C. §1329(a) and §1322(b)(5).

- 18 -

accordingly. Everhome's accounting system could not or would not adapt to the realities of the Debtor's bankruptcy. The Trustee's payments come at a time and in an amount dictated by Debtors' confirmed plan. Thus, a payment from the Trustee is not going to fall on a due date or be in the exact amount of a monthly payment. Because Everhome could not or would not distinguish the Trustee's payments for pre-petition arrearage from the Debtor's post-petition monthly payments, Everhome did not apply the Trustee's payments solely to the arrearage. Everhome's system created the illusion Debtors were making late and incomplete post-petition payments. Everhome then began rejecting Debtors' true monthly payments made outside the plan because Everhome's records erroneously showed Debtors to be in default post-petition. Because Everhome failed to properly and timely account for payments and failed to distinguish between pre-petition and post-petition payments, its own accounting system and payment history gave the impression Debtors were delinquent in their payments.

Everhome's application of payments without regard for whether the payments were for pre-petition arrearage or post-petition debt service was in derogation of the plan. The missed pre-petition monthly installments already included interest owed on the principal balance. Pre-petition interest was not to accrue additional interest post-petition. The entire allowed pre-petition arrearage claim was to be paid over the life of the plan in installments calculated by the Trustee. Everhome's payment allocation ignored this. Everhome then failed to apply three post-petition payments from Debtors, keeping Debtors' principal balance artificially high and accruing more interest than it should.

Everhome applied Debtors' post-petition payments to pre-petition arrearage instead of to then currently due monthly installments. Everhome failed to apply three payments, and then, Everhome assessed post-petition late charges. Everhome also held the Trustee's payments in

08.05.05 Payne v MERS.wpd

suspense for months, again keeping Debtors' principal balance artificially high and accruing more interest than it should. Everhome then paid two late fees before paying insurance and taxes even though the mortgage requires payments to be applied first to outstanding escrow deficiencies.

Everhome assessed inspection fees against Debtors without notice and without cause. Debtors continuously occupied and maintained their home. Debtors were in constant contact with Everhome's counsel. Everhome presented no evidence it relied on the drive-by inspections to make an informed decision almost each month that another property inspection was needed. Further, Everhome's own accounting and failure to apply payments properly produced the appearance of a post-petition default which triggered the inspections. Additionally, Everhome deemed the loan in default only when it suited Everhome. For example, default triggered post-petition inspections and fees, but Everhome did not consider Debtors in default when Everhome excused itself from doing an escrow analysis during the time the loan was in bankruptcy. Everhome's servicing of Debtors' loan and its bankruptcy policies regarding escrow shortages showed contempt for the confirmation order, erroneously treated Debtors as if they were in default post-petition, and effectively sabotaged Debtors' ability to complete their plan current on their obligations to Everhome.

**B.     Real Estate Settlement Procedures Act**

**1.     Qualified Written Requests**

RESPA is a remedial consumer-protection statute.[38]  Congress enacted RESPA to insure consumers are provided with information regarding the nature and costs of servicing their home

_____

[38]  *In re Rawlings,* 64 F. Supp. 2d 1156, 1165 (M.D. Ala. 1999).

- 20 -

loans.[39]  RESPA allows consumers to obtain information about their residential mortgages and

penalizes companies which do not comply.[40]  RESPA governs how and when a loan servicer

must respond to a borrower's complaints about the servicing of the loan.  If a servicer receives a

qualified written request from a borrower or the borrower's agent, the servicer shall provide a

written response acknowledging the request within 20 days.[41]  A qualified written request must

be written correspondence identifying the borrower's name and account and include a statement

of why the borrower believes the account is in error or otherwise identifying the information

sought by the borrower.[42]  Federal regulations implementing RESPA allow a servicer to establish

a separate and exclusive office and address for receipt of qualified written requests.[43]  Within 60

days of receiving a qualified written request, the servicer shall make one of the following three

written responses to the borrower.  First, the servicer shall make the appropriate corrections and

send the borrower a written notice of the correction.  Second, if the servicer determines the

account is not in error, the servicer must provide the borrower with a written response informing

the borrower why the servicer believes the account is correct.  Third, if the borrower requested

information the servicer cannot provide, the servicer shall explain why the information is

unavailable or cannot be obtained.  Each of the three possible responses shall include the name

and telephone number of the servicer's representative who can provide additional assistance to

the borrower.[44]

---

[39]  12 U.S.C. §2601(a); *In re Figard,* 382 B.R. 695, 712 (Bankr. W.D. Pa. 2008).
[40]  *Id.*
[41]  12 U.S.C. §2605(e)(1)(A).
[42]  12 U.S.C. §2605(e)(1)(B).
[43]  24 C.F.R. §3500.21(e)(1).
[44]  12 U.S.C. §2605(e)(2)(A), (B), and (C).

08.05.05 Payne v MERS.wpd

RESPA imposes additional obligations on lenders which are implemented by corresponding federal regulations.[45]  Particular to this case, RESPA requires a loan servicer to perform an annual escrow analysis and to provide a borrower with notice, at least once a year, of any shortfall or deficiency when the loan documents require the borrower to deposit into an escrow account with the servicer payments for taxes, insurance premiums, and other charges.[46]

### 2.    RESPA Applies to Borrowers in Bankruptcy

Some bankruptcy courts have grappled with whether RESPA governs in bankruptcy or whether the Bankruptcy Code implicitly repeals RESPA requirements.[47]  *Nosek* found a RESPA qualified written request was trumped by the claims objection procedure laid out by the Bankruptcy Code.  *Figard*, on the other hand, found both RESPA and the Bankruptcy Code provided alternative procedures to obtain information and to resolve questions concerning the lender's claims. *Figard* found debtors could use one or the other, or both, and each statutory scheme could co-exist and be used within their own requirements and deadlines.  For example, a borrower may send a qualified written request subject to RESPA's 20-day and 60-day deadlines. However, a debtor in bankruptcy may also serve discovery requests subject to the Federal Rules of Civil Procedure as incorporated by the Federal Rules of Bankruptcy Procedure and supplements by local court rules.  The qualified written request is not subject to the deadlines imposed by the Federal Rules of Civil Procedure.  The discovery responses are not subject to RESPA.  Each manner of requesting information is a viable option and subject to enforcement if ignored. Concurrent means of accomplishing the same task are not necessarily incompatible and may proceed on their parallel paths.

---

[45] 12 U.S.C. §2601 *et seq.*; 24 C.F.R. §3500.1 *et seq.*
[46] 12 U.S.C. §2609(b); *In re Dominique*, 368 B.R. 913, 916 (Bankr. S.D. Fla. 2007).
[47] *In re Figard*, 382 B.R. at 712; *In re Nosek*, 354 B.R. 331, 339 (D. Mass. 2006).

### 3.    Debtors' RESPA Allegations

Debtors bear the burden of persuasion to show RESPA violations.[48]  Regarding Everhome's lack of response to Debtors' qualified written requests, Debtors must first establish they sent qualified written requests.  Debtors and Defendants have been represented by counsel since at least August 21, 2001.  In that time, Debtors' counsel has sent numerous letters and discovery requests to Defendants' counsel.  Debtors contend many of these letters and discovery requests constituted qualified written requests under RESPA.

In this case, Debtors failed to establish their many letters and discovery requests directed to Defendants' counsel made in anticipation of and in the heat of litigation constituted qualified written requests.  Just because counsel includes a RESPA citation in discovery instructions does not transform the discovery requests into a RESPA request.  Likewise, every letter to lender's counsel is not necessarily a RESPA request.  In this case, the Court does not reach the issue of whether a RESPA qualified written request may be sent to lender's counsel rather than to the lender's designated address.  This is a matter of equity.  RESPA does not designate lender's counsel as an authorized recipient of a qualified written request.  Before an attorney is to be held accountable as an agent by virtue of a statute which does not itself pre-authorize an attorney as the lender's agent in this context, the attorney should be placed on notice that he or she is being approached in that capacity.  In this case, letters sent to Defendants' counsel before the lawsuit did not identify the letters as RESPA requests.  Defendants' counsel rejected a February 20, 2004, request for a detailed accounting of Debtors' loan, referring Debtors' counsel directly to her client.  Had Debtors' counsel sent qualified written requests to lender's counsel identifying

---

[48]  *In re Tomasevic,* 275 B.R. 103, 114 (Bankr. M.D. Fla. 2001).

them as such, and lender's counsel did not object, the issue of whether this procedure is proper under RESPA would be worth considering. However, these are not the facts of this case.

The situation is more analogous to a motion for relief from stay. Even though the debtor is represented by counsel, the motion is not considered served by merely sending a copy to counsel. The debtor himself must be served pursuant to court rules.[49] Likewise, RESPA and its implementing regulations provide the procedure to trigger RESPA obligations, and in turn, RESPA sanctions for noncompliance. A servicer subject to RESPA may establish a specific address to receive qualified written requests. Everhome designated such an address. Counsel may overcome the perceived ethical problem of contacting an entity known to be represented by counsel by sending the qualified written request to both the servicer and its counsel, just as a lender serves a stay relief motion on both the debtor and his counsel. Delivery to counsel without notice of invoking RESPA is insufficient where RESPA and the federal regulations provide a specific procedure. The proper procedure must be followed before a court may award sanctions. Accordingly, Debtors have established only one qualified written request sent directly to Everhome - the March 25, 2004, letter.

### 4. Everhome's Defense

RESPA contains a 60-day safe harbor for the servicer to respond to a qualified written request.[50] Defendants argue Debtors preempted this safe harbor by filing suit 50 days after sending the March 25, 2004, qualified written request. When a statute provides that proceedings are to be commenced after the expiration of a certain time, that time must fully expire before the proceedings may be instituted. Dismissal may be proper, but another proper remedy for

---

[49] Fed. R. Bankr. P. 9014 and 7004.
[50] 12 U.S.C. § 2605((f)(4).

premature litigation is a stay of the claim until it has matured.[51]  Because RESPA is remedial in character, it should be liberally construed to achieve its purpose.[52]  Further, "it is a general policy of law to find a way in which to prevent loss of valuable rights, not because something was done too late but rather because it was done too soon."[53]  Thus, where a Title VII civil rights claimant filed her action before exhausting her administrative remedies in the time frame set out in the statute, the proper remedy was to stay the proceeding until the prerequisites to suit were satisfied.[54]  A premature lawsuit may mature while the case is pending.[55]

In this case, Debtors allege they sent several qualified written requests.  As to most of those alleged requests, the filing of the lawsuit was not premature.  However, at trial Debtors could not prove RESPA violations as to those requests because Debtors could not prove the letters sent only to Defendants' counsel were in fact qualified written requests under RESPA.  However, Defendants concede the March 25, 2004, letter to Everhome was a qualified written request.  Defendants' only defense in failing to respond to the March 25, 2004, letter is Debtors cut off their time to respond by filing suit.  Everhome did not request the case be dismissed or stayed.  Given RESPA requires compliance, and given litigation would have and in fact did instigate discovery to obtain the same information, Everhome did itself a disservice by freezing further communication with Debtors.  Everhome's response date to the qualified written request was May 24, 2004.  The answer date to Debtor's suit was not until June 14, 2004.  Thus, the

---

[51] *Federal Election Comm'n v. Nat'l Rifle Ass'n of America,* 553 F. Supp. 1331, 1333 (D.C.D.C. 1983).

[52] *In re Rawlings,* 64 F. Supp. 2d at 1165.

[53] *Hiduchenko v. Minneapolis Medical & Diagnostic Center, Ltd.,* 475 F. Supp. 1175, 1178 (D. Minn. 1979), quoting *Henderson v. Eastern Freight Ways, Inc.,* 460 F.2d 258, 260 (4th Cir. 1972).

[54] *Hiduchenko,* 475 F. Supp. at 1181.

[55] *Kubrick v. U.S.,* 435 F. Supp. 166, 168 (E.D. Pa. 1977), *aff'd,* 581 F.2d 1092, 1098 (3rd Cir. 1978), *rev'd on other grounds,* 444 U.S. 111 (1979) (jurisdictional defect may be cured where six-month period elapsed prior to any substantial progress in the litigation); *but see Insurance Co. of North America v. U.S.,* 561 F. Supp. 106, 117 (E.D. Pa. 1983) (filing suit within three days of administrative claim deemed a deliberate flouting of the requirement that an agency have six months free of litigation to attempt to resolve the matter).

08.05.05 Payne v MERS.wpd

cause of action matured between the filing date and the answer date. Everhome could have responded to Debtors' inquiries and rendered the RESPA issue moot as to the March 25, 2004, request. Instead, Defendants proceeded with the litigation through trial without providing a response. Although Defendants continued to raise the premature filing as a defense, Everhome failed to cite any authority to support its decision to disregard the March 25, 2004, RESPA request throughout the pendency of the suit. A premature lawsuit does not excuse compliance. At trial, Everhome did not present any evidence it had provided Debtors with a narrative explanation of the account. In fact, the Everhome witness at trial was still identifying Trustee payments as late and partial payments made by Debtors. Three years after the March 24, 2004, qualified written request, an Everhome representative still could not explain or differentiate Everhome's application of post-petition payments and the Trustee's payments.

### 5.     Failure to Provide Notice of Escrow Deficiency

Under RESPA, the servicer is required to notify the borrower "at least once during the escrow account computation year if there is a shortage or deficiency in the escrow account. The notice may be part of the annual escrow account statement or it may be a separate document."[56] While lenders are exempt from providing the annual escrow account statement to borrowers in bankruptcy,[57] the servicer is not exempt from its obligation to conduct the escrow analysis annually and to notify the borrower if there is a shortage or deficiency.[58] Compliance with RESPA does not violate the automatic stay.[59]

In *Dominique,* a case factually similar to this case, the lender did not provide notice of escrow shortfalls during the bankruptcy and attempted to recover the expense at the end of the

---

[56]  24 C.F.R. §3500.17(f)(5).
[57]  24 C.F.R. §3500.17(i)(2).
[58]  24 C.F.R. §3500.17; *In re Dominique,* 368 B.R. at 916.
[59]  *Chase Manhattan Mortgage Corp. v. Padgett,* 268 B.R. 309, 314 (S.D. Fla. 2001).

08.05.05 Payne v MERS.wpd

case.[60]  The debtors moved to have the escrow amounts advanced by the lender without notice to them deemed discharged.  The court found the bankruptcy did not exempt the lender from its RESPA obligations to perform the escrow analysis and to provide debtors with notice of deficiencies.  The court recognized contractual post-petition charges are not subject to the automatic stay, and §1322(b)(2) prohibits debtors from modifying their contractual rights with their home lenders.[61]    However, the court, following *Chase Manhattan Mortgage Corp. v. Padgett*,[62] found the lender waived its right to recover post-confirmation advances made for taxes and insurance when the lender made the advances over several years without notice to the debtors in bankruptcy.[63]  A lender cannot hide behind the debtor's bankruptcy to avoid complying with its own obligations.  A lender may not recover advances made on behalf of borrowers without at least an annual notice to the borrower of the advance and the resulting escrow deficiency.  In this situation, waiver is an available equitable remedy.  When a lender silently accepts payments for over three years without notifying the borrower the payments are insufficient, when the borrower believes his taxes and insurance are being paid by his monthly payments to his lender, and when the borrower has no reason to know the lender is advancing taxes and insurance and thereby increasing borrower's indebtedness, the lender waives his right to recover the advances from the borrower.[64]

        Everhome admitted it never provided Debtors with notice that their debt service payment was insufficient to cover annual escrow shortages.  In fact, Everhome's policy is not to perform an escrow analysis during the time the loan is in bankruptcy.  Instead, Everhome does the

---

[60]   *In re Dominique,* 368 B.R. at  913.

[61]   *Id.* at 917-18.

[62]   268 B.R. 309 (S.D. Fla. 2001).

[63]   *Dominique,* 368 B.R. at  921; *see also In re Johnson,* – B.R. –, 2008 WL 963436, at *11 (Bankr. E.D. Mich. Apr. 9, 2008).

[64]   *Id.*

08.05.05 Payne v MERS.wpd

analysis once the loan emerges from bankruptcy and adjusts the monthly payment to reflect the increase at that time. Everhome adheres to this policy even if the loan is in bankruptcy for 60 months and the account falls behind thousands of dollars, as occurred in this case. At trial, Everhome's representative testified the escrow deficiency had risen to $8,879.31.

### 6. Everhome Violated RESPA

Everhome did not adequately respond to Debtors' qualified written request. Debtors sought information from Everhome concerning the escrow deficiency, late fees, interest, attorney's fees and costs. On March 25, 2004, Debtors requested a narrative explanation of their account. A response would have necessarily caused Everhome to review the manner in which it applied (and failed to apply) post-petition payments and Trustee payments. A response would have necessarily explained the escrow deficiency as well as the other post-petition charges. Since December 17, 2004, Debtors have specifically requested their current, correct, monthly escrow payment. Everhome's responses were unexplained payoff letters containing an itemization. Everhome claimed their response was enough and Debtors simply rejected the responses because it was not the response they wanted. However, the Court's review of Everhome's accounting history, an arduous task, shows Debtors were correct with their concerns. Everhome's failure to respond to a qualified written request and failure to notify Debtors of post-petition changes to their escrow account violated RESPA.

### C. Violations of the Automatic Stay

The automatic stay restrains creditors from continuing any collection efforts against the debtor or property of the estate.[65] An individual injured by any willful violation shall recover actual damages, including costs and attorney's fees, and may recover punitive damages.[66] The

---

[65] *In re Johnson,* 501 F.3d 1163, 1169 (10th Cir. 2007).
[66] 11 U.S.C. §362(k)(1), formerly §362(h).

- 28 -

debtor bears the burden of establishing, by a preponderance of the evidence, the creditor knew of the automatic stay and intended the actions which constituted the violation.[67]  No specific intent in required.  Actions taken post-petition such as improperly applying trustee payments,[68] refusing to remove disallowed fees,[69] attempting to collect disallowed fees from debtors via a payoff letter,[70] and assessing and collecting post-petition fees without notice to debtors can violate the stay.[71]

Recently, mortgage lenders argued an order disallowing claims for post-petition fees and costs only applied during the bankruptcy proceeding, and such fees survived the bankruptcy and could be recovered from the collateral after the Chapter 13 case closed.[72]  Finding the lender's interpretation of §1322(b)(2) completely unsupportable, *Watson* held a disallowed fee based on a finding the fee was unreasonable extinguished the lender's right to payment without modifying the lender's contractual rights.[73]  Thus, any attempt to recover a disallowed fee violates the protections afforded a debtor in bankruptcy.

Everhome violated the stay.  Everhome applied the Trustee's payments to disallowed pre-petition late fees instead of to the allowed pre-petition claim.  Everhome refused to remove disallowed fees, and even at trial testified the fees would remain until paid.  Everhome communicated to Debtors an attempt to collect the disallowed fees in payoff letters.   Further, Everhome stipulated to the October 2003 Order disallowing all pre-petition claims except for

---

[67] *In re Johnson,* 501 F.3d at 1172.

[68] *In re Sanchez,* 372 B.R. at 314.

[69] *In re McCormack,* 203 B.R. 521 (Bankr. D.N.H. 1996).

[70] *In re Sullivan,* 367 B.R. 54 (Bankr. N.D.N.Y. 2007); *Mann v. Chase Manhattan Mortgage Corp.,* 316 F.3d 1 (1st Cir. 2003).

[71] *In the Matter of Stark,* 242 B.R. 866 (Bankr. W.D.N.C. 1999); *but see In re Campbell,* 361 B.R. 831 (Bankr. S.D. Tex. 2007); *In re Padilla,* 379 B.R. 643 (Bankr. S.D. Tex. 2007).

[72] *In re Watson,* – B.R. –, 2008 WL 934771, at *4 (Bankr. D. Del. Apr. 7, 2008).

[73] *Id.*, at *8.

08.05.05 Payne v MERS.wpd

missed installment payments. Everhome thereby waived its right to ever collect those fees and is estopped from now claiming it intended to hold the fees in abeyance until after the case closed.

### D. Damages

An individual injured by any willful violation of the automatic stay shall recover actual damages, including costs and attorney's fees, and may recover punitive damages.[74]

Failure to respond to a qualified written request under RESPA requires the lender to compensate the individual borrower for any actual damages the borrower incurs as a result of the failure.[75] Actual damages may include recovery for emotional distress.[76] The court may also award costs and reasonable attorney's fees.[77] The plaintiff must prove his actual damages and prove they were proximately caused by the defendant's RESPA violation.[78]

Lastly, when a confirmed plan has been ignored and undermined, §105 permits this Court to take any action or make any determination necessary to enforce its confirmation order and set this case on the right course.[79] The Court has both inherent and statutory power to impose sanctions for contempt in order to impose compliance, to compensate an injured party, and to punish the refusal to do what is required.[80]

The Court finds Debtors' actual damages equal the amount of overcharged interest, accrued and unnoticed fees, charges, and escrow deficiencies assessed from the petition date through the trial date, April 24, 2007. Due to misapplied payments, lost payments, collection of disallowed late fees, failure to respond to Debtors' qualified written request, and failure to

---

[74] 11 U.S.C. §362(k)(1), formerly §362(h).

[75] 12 U.S.C. §2605(f)(1).

[76] *In re Thompson*, 350 B.R. 842, 851 (Bankr. E.D. Wisc. 2006).

[77] 12 U.S.C. §2605(f)(3).

[78] *In re Tomesevic*, 273 B.R. 682, 687 (Bankr. M.D. Fla. 2002).

[79] *In re Schuessler*, – B.R. –, 2008 WL 1747935, at *1 (Bankr. S.D.N.Y. Apr. 10, 2008).

[80] *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991); 11 U.S.C. §105(a); *In re Aspen Limousine Service, Inc.,* 198 B.R. 341, 344, 349 (D. Colo. 1996).

- 30 -

properly service Debtors' loan while Debtors were in bankruptcy, Everhome proximately caused Debtors to incur excessive interest, unjustified late fees, unreasonable inspection fees, unreasonable legal costs, and an excessive escrow deficiency.

The Trustee shall disburse the remaining $2,371.07 collected from Debtors to Everhome pursuant to the plan. This amount shall cure all pre-petition arrearage, including all outstanding pre- and post-petition claims for interest up to and including the trial date, bringing the note current as of the trial date.

Everhome has waived its right to recover the $8,879.31 in advanced escrow charges by advancing the same without notice to Debtors. The Court finds Everhome's failure to respond to Debtors' qualified written request, which would have disclosed and explained the escrow shortages, proximately caused Debtors to be damaged in the amount of $8,879.31 as of the trial date.

The Court further finds Everhome's inspection fees were not noticed to Debtors, not necessary, and not reasonable. The Court finds Everhome's conduct damaged Debtors in the amount of $735.00 assessed against Debtors' account.

The Court further finds Everhome's servicing of the loan wrongly assessed $928.91 in late fees. The Court finds Everhome's conduct damaged Debtors in the amount of $928.91 assessed against Debtors' account.

The Court further finds Everhome's legal costs were previously disallowed by this Court pursuant to Everhome's stipulation, and additional foreclosure costs were never disclosed nor approved. Everhome's disregard for this Court's orders and procedures has damaged Debtors in the amount of $2,455.00 assessed against Debtors' account.

- 31 -

The Court further finds Everhome's conduct proximately caused Debtor Valerie Payne emotional distress for which she sought and received medical treatment. Debtor shall be awarded $500 for emotional distress.

Debtor Valerie Payne testified Everhome's failure to respond to her qualified written request kept her from refinancing her mortgage and forced her to abandon plans for a new home. Debtor had sought and received approval for a new loan in an amount $40,000.00 higher than her current mortgage and with the same nine percent interest rate. After closing costs, Debtors expected to receive about $28,000.00 to apply toward the new home site. After purchasing the land, Debtors had planned to sell their current home and purchase a mobile home with the proceeds. Debtors paid $100 as an earnest money deposit. Debtors paid $250 to have their current house appraised. Debtors never filed a motion with the Court to incur debt and abandoned their refinancing efforts sometime in 2004. With this evidence, any award of damages beyond Debtors' out-of-pocket expenses based on Debtors' inability to refinance their loan would be mere speculation. The Debtors actually have less debt and did not incur almost $10,000.00 in closing costs. Intangibles such as the probability of (1) the successful completion of the land sale, (2) the sale of the Debtors' home, (3) the successful purchase of a new mobile home and at what cost are not quantified in the record. The Court would have to make too many assumptions to arrive at an actual damage amount to award Debtors under this category. Thus, the Court cannot base an award upon speculation and must address the actual damages Debtors suffered as they attempted to draw information from Everhome. Debtors have proven and shall be awarded $350 for their out-of-pocket expenses to compensate Debtors for the earnest money deposit and home appraisal.

Debtors may recover punitive damages.[81]  The Court finds Everhome violated the
automatic stay, the October 6, 2003, Order, and the March 19, 2002, confirmation order.  Under
these circumstances, Everhome acted with reckless disregard for the Court's orders and Debtors'
rights.  Everhome's blind reliance on its computer system, its inability to identify its own
accounting errors even at trial, and its bankruptcy policies which violate RESPA and undermine
a confirmed bankruptcy plan justify an award of punitive damages to encourage Everhome to
change its policies and procedures.  Accordingly, Debtors are awarded $2,500.00 in punitive
damages.

The Court further finds Debtors are entitled to recover the costs of this action together
with reasonable attorney's fees.  The Court reserves judgment on an award of attorney's fees and
costs until it reviews Debtors' counsel's fee application.  Mr. William Peters shall file a fee
application and serve a redacted statement for services upon Defendants within 20 days from the
date of this Judgment.  Defendants shall have ten days to object to the amount of fees.  The Court
shall make a final fee award based upon Mr. Peters' fee application and any objections it
receives.  The Court reserves the right to include any other costs after a review of Mr. Peters' fee
application.  Defendants shall pay Debtors' attorney's fees directly to Mr. Peters.

Accordingly, judgment shall be entered, jointly and severally, against Everhome and
MERS in favor of Debtors in the total amount of $16,348.22 as of the trial date.  The judgment
shall be satisfied as follows.  Defendants shall pay Debtors $3,350.00 for emotional distress, out-
of-pocket expenses, and punitive damages awarded.  Everhome is ordered to correct Debtors'
account pursuant to RESPA, including crediting Debtors' account in the amount of $12,998.22
in disallowed charges as of the trial date and crediting the Trustee's final payment of $2,371.07

---

[81]  11 U.S.C. §105(a) and pre-BAPCPA 11 U.S.C. §362(h).

08.05.05 Payne v MERS.wpd

upon its receipt.  Everhome shall transmit to Debtors a written notification of the crediting of their account and written verification unequivocally stating the account is current through the trial date.  Everhome shall conduct an escrow analysis for the period from the trial date through the date of this Order and transmit to Debtors a written statement communicating the results of the escrow analysis and advising Debtors of their proper monthly payment effective July 1, 2008.  Everhome is ordered to comply with Standing Order 07-4 from the date of this Order until the case is closed or dismissed.  Everhome shall not assess any post-trial inspection fees, late fees, or legal costs against Debtors without prior approval of this Court so long as the case is pending.

### Conclusion

For the reasons set forth above, the Court concludes Defendants violated the confirmation order, RESPA, and the automatic stay. The Court shall enter a separate judgment against Defendants in favor of Debtors in accord with the foregoing.  A supplemental order shall be entered awarding attorney's fees and costs.

### ###

ROBERT D. BERGER
U.S. BANKRUPTCY JUDGE
DISTRICT OF KANSAS

- 34 -

08.05.05 Payne v MERS.wpd

Case 04-06078    Doc# 62    Filed 05/06/08    Page 34 of 34